***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman, and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. The Full Commission affirms in part and reverses in part the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times the employee-employer relationship existed between plaintiff and defendant-employer.
3. The carrier on the risk was Legion Insurance Company, with its successor statutory insurer, North Carolina Insurance Guaranty Association, now on the risk as the result of the carrier's bankruptcy proceedings.
4. The employee's average weekly wage on May 10, 1999 was $447.72, which yields a compensation rate of $298.49.
5. On May 10, 1999 Plaintiff injured his right wrist in an injury by accident while in the course and scope of his employment with defendants.
6. Defendants accepted plaintiff's claim as compensable by filing a Form 60 and continue to pay temporary total disability benefits to plaintiff.
7. The parties stipulated the following exhibits into evidence at the hearing before the Deputy Commissioner:
a. Stipulated Exhibit 1 — a packet of Industrial Commission records.
b. Stipulated Exhibit 2 — a packet of physical therapy records.
c. Stipulated Exhibit 3 — a packet of medical records.
8. The following exhibits were entered into the evidence of record by the parties at the hearing before the Deputy Commissioner:
Plaintiff's Exhibit 1 — summary of plaintiff's education and work history
Plaintiff's Exhibit 2 — photograph
Plaintiff's Exhibit 3 — document entitled medications
9. The depositions and records of Gary L. Sigmon, and Bernard Moore are a part of the evidence of record.
10. The issues before the Commission are whether plaintiff continues to be disabled as a result of his compensable injury; if so, is he permanently disabled; should plaintiff be ordered to cooperate with vocational rehabilitation; and to what additional benefits is plaintiff entitled.
 ***********
The Full Commission rejects the findings of fact found by the Deputy Commissioner and makes the following:
 FINDINGS OF FACT
1. Plaintiff was sixty years old at the time of the hearing before the Deputy Commissioner and has a ninth grade education. He began working for defendants in April 1993 as a truck driver. Plaintiff's job involved driving a tractor-trailer to transport furniture from North Carolina to New England. Plaintiff worked as a truck driver most of his career.
2. On May 10, 1999, plaintiff sustained a compensable injury by accident when he was trying to get a dresser out of his truck and the weight of the dresser caused plaintiff to hyperextend his right hand.
3. Plaintiff was seen on May 29, 1999 by Dr. Jamal Kalala who diagnosed plaintiff with right carpal tunnel syndrome.
4. Nerve testing confirmed Dr. Kalala's diagnosis. On June 4, 1999, Dr. Kalala referred plaintiff to Dr. Stephen J. Sladicka, an orthopedic surgeon.
5. Dr. Sladicka examined plaintiff on June 17, 1999, and also diagnosed plaintiff with carpal tunnel syndrome. Dr. Sladicka prescribed medication and a brace for plaintiff to wear on his wrist.
6. Plaintiff did not return to the doctor until October 6, 1999, over three months later, after missing two appointments without calling to cancel them. Dr. Sladicka continued to recommend conservative treatment, and plaintiff kept working as a truck driver.
7. On January 18, 2000, defendants executed a Form 19, Report of Injury to Employee, which was filed on February 7, 2000.
8. When plaintiff saw Dr. Sladicka for a follow-up visit on January 26, 2000, plaintiff reported increased symptoms and indicated he was ready to have surgery. Plaintiff experienced problems changing gears and had to steer with his left hand.
9. Dr. Sladicka tried to schedule surgery at that time, but the procedure was delayed so that a suspicious spot on plaintiff's lung could be investigated. Tests of plaintiff's lung proved to be negative, and surgery was scheduled.
10. On March 8, 2000, plaintiff underwent the right carpal tunnel release which was performed by Dr. Sladicka.
11. At the follow-up visit on April 4, 2000, plaintiff reported that he experienced pain at the incision when he shifted gears. Plaintiff told Dr. Sladicka that there was no light work available, so Dr. Sladicka kept him out of work.
12. Surgery was subsequently scheduled for plaintiff's left hand, which was not injured in the May 10, 1999 accident and defendants, in a separate claim, refused to pay for that procedure.
13. Defendants admitted liability for plaintiff's injury to his right wrist by filing a Form 60, Employer's Admission of Employee's Right to Compensation, on May 11, 2000. Defendants began payment of compensation to plaintiff on March 8, 2000.
14. When plaintiff saw Dr. Sladicka on April 20, 2000, he expressed considerable anger at defendants' refusal to pay for his left hand surgery and indicated that he would not use his own insurance to pay for the surgery until the workers' compensation claim was settled.
15. Plaintiff then complained of worse pain in his right wrist and said that he could not shift gears. He also indicated that he did not want to go back to work. Dr. Sladicka kept him out of work for three weeks and sent him to occupational therapy. Although plaintiff was to return to Dr. Sladicka after the three-week period, he apparently never returned.
16. On May 26, 2000, CompCare's rehabilitation nurse, Nancy Holdclaw, scheduled an evaluation of plaintiff's right wrist by Dr. Forney Hutchinson.
17. Dr. Hutchinson examined plaintiff on June 7, 2000 and released plaintiff to return to work with modified restrictions of no lifting greater than five pounds and no repetition with the right hand. Plaintiff complained of numbness in the ulnar nerve distribution as opposed to the median nerve on which Dr. Sladicka had operated. Plaintiff also had some triggering of his right ring finger.
18. Dr. Hutchinson ordered nerve testing which revealed an abnormal study with some mild median neuropathy at the right wrist consistent with a clinical diagnosis of carpal tunnel syndrome but no clear evidence of ulnar neuropathy.
19. On June 23, 2000, Dr. Hutchinson noted that plaintiff had persistent symptoms of discomfort and continued to have the same limitations as far as job function was concerned. Dr. Hutchinson changed the physical therapy ordered at that time. Plaintiff returned with triggering of his ring and little fingers, and Dr. Hutchinson recommended an operative procedure to release the pulleys involved.
20. Dr. Hutchinson released plaintiff to return to work with the restriction of no lifting over five pounds and no repetitive motion or strong grip with his right hand.
21. Plaintiff returned to Dr. Hutchinson on July 21, 2000 with persistent and increasing symptoms of triggering of his right ring and little finger.
22. Dr. Hutchinson performed surgery on August 25, 2000 to release plaintiff's trigger finger, right ring and little fingers. Plaintiff was subsequently referred to physical therapy.
23. On September 7, 2000, Dr. Hutchinson released plaintiff to return to work with restrictions of no lifting over two pounds.
24. On September 20, 2000, Dr. Hutchinson increased plaintiff's lifting restrictions to five to ten pounds with no strong grip or pinch or twist of the right hand.
25. On October 6, 2000, plaintiff saw Dr. Hutchinson for treatment for second-degree chemical burns to his right hand. The physical therapist was supposed to use 3% acetic acid to break up scar tissue on his hand, but instead used 100%. Plaintiff had increased pain, which was treated with Vicodin.
26. Plaintiff filed a Form 18, Notice of Accident to Employer and Claim of Employee, on December 14, 2000 which stated plaintiff sustained an injury to his left wrist and right elbow.
27. Dr. Hutchinson felt plaintiff had improved at his October 20, 2000 visit but noted slow progress that was compounded by the problem in physical therapy. Plaintiff was sent to a different physical therapist and remained on the same work restrictions. Dr. Hutchinson felt plaintiff was limited to using his right hand as "a light assist."
28. On plaintiff's November 17, 2000 visit, Dr. Hutchinson felt plaintiff continued to show progress.
29. At plaintiff's December 20, 2000 visit, Dr. Hutchinson noted that plaintiff was making modest progress. He gave plaintiff a splint, prescribed Vioxx and one more week of physical therapy after which plaintiff was released to unrestricted work.
30. Plaintiff returned to Dr. Hutchinson on January 11, 2001, complaining of continuing wrist pain. Plaintiff described an incident in which he had carried a can of diesel fuel and felt a twinge in his hand, then reached for a doorknob and felt his right hand contract into a flexed position. After examining plaintiff, Dr. Hutchinson noted that plaintiff's pain was on the top of his wrist and that he had no previous problems in this area. Dr. Hutchinson concluded that the pain on top of plaintiff's wrist was poorly defined and was unrelated to his prior injury at work. This visit to Dr. Hutchinson is the only time pain on top of plaintiff's wrist is noted in the medical records. Dr. Hutchinson gave plaintiff a splint and work restrictions of lifting no more than ten to fifteen pounds for three weeks.
31. On January 31, 2001, plaintiff returned to Dr. Hutchinson without improvement and with persistent pain in the palm of his right hand in the area of the previous trigger finger surgery. Dr. Hutchinson felt no surgical options were available and that conservative treatment had been unsuccessful. Plaintiff continued to have a ten to fifteen pound lifting restriction.
32. Defendants filed a Form 24, Application to Terminate or Suspend Payment of Compensation, on February 9, 2001, which was denied by the Commission.
33. On February 21, 2001, plaintiff sought treatment with Dr. Hutchinson for ongoing complaints of wrist pain, with the primary area of discomfort on the ulnar side and persistent sensitivity and pain in the palm of his hand. Dr. Hutchinson ordered a functional capacity evaluation and rated plaintiff's permanent partial disability at 4% to his right hand pending the outcome of the FCE. Dr. Hutchinson continued the fifteen pound lifting limit.
34. The FCE was performed by Jennie Rhyne, a physical therapist at Optima Therapies in Lincolnton, on February 28, 2001. Ms. Rhyne felt plaintiff failed to give maximum consistent effort on several of the tests. She found plaintiff was guarded and cautious with his right hand. She noted he demonstrated pain behavior and a reluctance to proceed beyond certain points in certain tests. For example, plaintiff demonstrated right hand lifts and push/pulls but was not willing to grasp or increase weight limits. Plaintiff did respond receptively to verbal feedback and appropriate corrections and instructions on technique.
35. The Full Commission finds that Ms. Rhyne's evaluation is inconsistent with the evaluations and observations of plaintiff's treating physicians and physical therapists as to his sincerity and effort, and therefore little weight is given to the results of the FCE performed by Ms. Rhyne.
36. Dr. Hutchinson relied heavily upon the FCE results, and at plaintiff's final evaluation on March 9, 2001, Dr. Hutchinson found plaintiff was at maximum medical improvement and released plaintiff to return to work with no restrictions.
37. Plaintiff did not return to work at that time and had no contact with his employer. Mr. Hawn, owner of defendant-employer, had turned the business over to his son and had no trucks available after February of 2001. The company ceased doing business in June 2001.
38. Defendants hired Bernard Moore, a vocational rehabilitation counselor, to work with plaintiff to find alternative employment. Mr. Moore met with plaintiff and his attorney on July 26, 2001 and began to help plaintiff search for other jobs in the area, beginning with positions that had the highest wages.
39. Mr. Moore testified he was disappointed in plaintiff's effort but reported plaintiff did cooperate with vocational rehabilitation efforts and plaintiff did seek employment as Mr. Moore recommended. Mr. Moore described the job environment in Hickory, North Carolina where plaintiff lived as "very, very tight." Mr. Moore contacted plaintiff's former employer, Mr. Hawn, who told Mr. Moore that neither he nor his son had a job that plaintiff could perform because all available jobs required transporting and loading furniture.
40. On March 21, 2002, plaintiff was seen by Dr. Anthony DeFranzo, a hand surgeon at Baptist Medical Center, upon the referral of his attorney. Plaintiff complained of pain on the ulnar side of his right wrist. Dr. DeFranzo thought plaintiff's symptoms appeared to be coming from the area of the triangular fibrocartilage complex. An MRI on May 30, 2002 showed a tear in the triangular fibrocartilage adjacent to the radial attachment, fluid in the distal radioulnar joint and degenerative cysts in the radial aspect of the lunate.
41. On June 13, 2002, plaintiff continued to report pain on the ulnar side of his wrist. Dr. DeFranzo referred plaintiff to Dr. David S. Ruch, an orthopedic surgeon, for consideration of arthroscopic wrist surgery.
42. Dr. Ruch examined plaintiff on July 5, 2002 and concluded that with plaintiff's history and examination consistent with these findings, plaintiff had a combination of traumatic and degenerative conditions involving the distal radial ulnar joint.
43. Dr. Ruch diagnosed plaintiff with a central TFCC tear. Dr. Ruch's notes further explained:
 I have informed him that I think, to the extent to which his condition is secondary to trauma, we could ameliorate his symptoms; however, with his age of 60 and his ulnar positive variance of approximately 1 mm, I think there is going [to] be an associated impaction which may have resulted in some arthritis at this point. To that end, I am not certain that this would be entirely alleviated with an arthroscopy.
44. On July 5, 2002 Dr. Ruch assigned plaintiff a permanent partial disability rating of 14% to his right hand for this condition, not including plaintiff's impairment from his prior condition. Dr. Ruch gave plaintiff the choice of proceeding with a rating and release or having an arthroscopy splinting and therapy. Plaintiff elected to proceed with non-operative management.
45. Following the Executive Secretary's denial of defendants' second Form 24 Application, defendants requested a hearing before a Deputy Commissioner in this case in February 2002, contending that plaintiff was no longer disabled.
46. Plaintiff was evaluated by Gary L. Sigmon, a vocational rehabilitation specialist. Mr. Sigmon performed a functional hand study and found plaintiff's testing revealed he had lost a significant amount of strength in his right hand. Mr. Sigmon felt plaintiff's dexterity loss was 42.7% and that plaintiff could not engage in continuous work activity with his right hand that was consistent with his previous work history. Mr. Sigmon recommended light activities with a ten to fifteen pound permanent restriction to plaintiff's right hand. Mr. Sigmon did not feel that obtaining a GED would improve plaintiff's employment options, considering plaintiff's physical limitations, age and limited work experience.
47. Plaintiff reached maximum improvement with respect to the injury giving rise to this claim as of his release and rating by Dr. Ruch on July 5, 2002. Plaintiff testified at the Deputy Commissioner hearing that defendants stopped vocational rehabilitation efforts in March 2002. Plaintiff testified that prior to the hearing he had only looked for work at Strata Force, a temporary agency in Statesville.
48. The TFCC tear and related problems were causally related to the compensable injury by accident and were not the result of the incident carrying a can of diesel fuel on January 11, 2001. The pain symptoms plaintiff experienced after the diesel can incident were in a different area of his hand than his previously and subsequently reported areas of pain.
 ***********
Based upon the findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 10, 1999, plaintiff sustained a compensable injury by accident to his right wrist arising out of and in the course of his employment with defendants when he was unloading furniture. N.C. Gen. Stat. § 97-2(6).
2. Defendants admitted compensability of plaintiff's injury by accident by filing a Form 60 on December 6, 2000. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v. Charmes/Arby's RoastBeef, 142 N.C. App. 154, 542 S.E.2d 277, disc. rev. denied, 353 N.C. 729,550 S.E.2d 782 (2001).
3. In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of proof by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485, aff'd per curiam, 354 N.C. 355,554 S.E.2d 337 (2001); Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. PerdueFarms., Inc., supra.
4. In this claim, as of July 5, 2002 Dr. Ruch assigned a rating and released plaintiff from his care. As of this date plaintiff was not capable of returning to work as a truck driver, but was capable of some work and failed to produce evidence that he made a reasonable effort to find suitable employment. The greater weight of the evidence does not show that it would be futile for plaintiff to seek employment. Neither Dr. DeFranzo nor Dr. Ruch stated that plaintiff was unable to work in any employment. Therefore, plaintiff was no longer disabled as of July 5, 2002. N.C. Gen. Stat. §§ 97-2(9); 97-29; Russell V. Lowes ProductDistribution, supra.
5. As a result of plaintiff's injuries, plaintiff was disabled and was entitled to temporary total disability compensation at the rate of $298.49 per week from March 8, 2000 until July 5, 2002. N.C. Gen. Stat. § 97-29. To the extent this compensation has already been paid plaintiff by defendants, defendants are entitled to a credit.
6. "If additional medical treatment is required, there arises a rebuttable presumption that the treatment is directly related to the original compensable injury and the employer has the burden of producing evidence showing the treatment is not directly related to the compensable injury." Reinninger v. Prestige Fabricators, Inc., 136 N.C. App. 255,259, 523 S.E.2d 720, 723 (1999), quoting Pittman v. Thomas Howard,122 N.C. App. 124, 130, 468 S.E.2d 283, 286, disc. review denied,343 N.C. 513, 472 S.E.2d 18 (1996); Parsons v. Pantry, Inc.,126 N.C. App. 540, 485 S.E.2d 867 (1997). In the case at bar defendants failed to produce medical evidence that plaintiff's TFCC tear, which was the result of trauma, was not directly related to the compensable injury and therefore plaintiff is entitled to the presumption that the TFCC and related problems are causally related to the compensable injury by accident.
7. Plaintiff sustained an 18% permanent functional impairment to his right hand as a result of the compensable injury and is entitled to permanent partial disability compensation at the rate of $298.49 per week for 36 weeks. N.C. Gen. Stat. § 97-31(12). Defendants are entitled to a credit for any overpayment of temporary total disability compensation.
8. Plaintiff is entitled to have defendants pay all medical expenses incurred by plaintiff as a result of his compensable injury for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25; 97-25.1. The approved medical expenses include treatment of plaintiff's TFCC tear.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below, defendants shall pay temporary total disability compensation to plaintiff at the rate of $298.49 per week from March 8, 2000 until July 5, 2002. It appears from the record that defendants have already paid these amounts. To the extent that there is any accrued compensation, it shall be payable in a lump sum subject to the attorney's fee below.
2. Subject to a reasonable attorney's fee approved below and a credit for any overpayment of temporary total disability compensation, defendants shall pay plaintiff $298.49 per week for 36 weeks for the permanent functional impairment to his right hand.
3. A reasonable attorney's fee of twenty-five percent of the lump sum compensation awarded plaintiff in Paragraphs 1 and 2 of this AWARD is hereby approved for plaintiff's counsel and shall be deducted from those sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay all medical expenses incurred by plaintiff as a result of his compensable injury on May 10, 1999, including treatment of the TFCC tear.
5. Defendants shall pay the costs.
This the 21st day of January 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/kjd